**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **RICK MENDELSSOHN AND AMY** | § | |
| **BIRNBAUM, Individually and as** | § | |
| **attorneys in fact for J.M.** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 1:20-cv-203** |
| | § | **Jury Trial** |
| **AUSTIN INDEPENDENT SCHOOL** | § | |
| **DISTRICT & VINCENT WRENCHER, Sr.** | § | |
| **Defendants** | § | |

## PLAINTIFF'S FIRST ORIGINAL COMPLAINT

**NOW COMES** Rick Mendelssohn and Amy Birnbaum, Individually and with power of attorney from their son J.M., (collectively termed "the Plaintiffs") files this their *First Original Complaint* alleging that the Austin Independent School District (hereinafter referred to as "Austin ISD", "AISD" or the "School District") and Vincent Wrencher, Sr., Robotics and Engineering Teacher at Anderson High School, violated the various rights of J.M. as more specifically pled herein. Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof Plaintiffs would respectfully show this tribunal the following:

## I. BRIEF INTRODUCTION TO THE CASE

1.  Last year J.M. was a junior and star member of the Anderson High School Robotics Program. In fact last Spring, he and his team not only advanced past state and national competitions but into an International Competition, known as the VEX World Championships, as well.

2.  J.M. is also of Jewish heritage, descent, culture and religion. Earlier in the school year, around November, while in Robotics Lab J.M. saw a few coins on the ground and said

something to the effect of "Guess I should pick them up since I'm the Jew."   Robert
Stephany, a Volunteer Mentor with the Robotics program apparently took great exception
to this joke and reported it to Mr. Wrencher.   Wrencher threw J.M. off the team ostensibly
because he and Stephany deemed the joke to have Anti-Semitic overtones.   Importantly, J.M.
was not removed from the program that November but several months later when he and his
team had already advanced into the World Championship in VEX Robotics Competition.

3.      When he and his family attempted to get Wrencher and School Officials to permit J.M. to
return in the Robotics program and competitions like every other senior to be, he was not
permitted to do so.   Now thrown out of the program he loved and separated from teammates
and friends, he is isolated and alone. Moreover, he is unable to participate in valuable
competitions that would enhance both his standing for acceptance into a college program and
scholarship availability. In fact, Mr. Wrencher is the only person who could write a letter of
recommendation for a robotics scholarship and he has not done so.   Nor has he written a
letter of recommendation for J.M. to get into a college engineering program.   Worse yet,
Wrencher wrote a letter to a national organization attempting to blackball J.M. from Robotics
Competitions forever.

4.      The family's complaints have never been investigated pursuant to federal law, regulations,
or executive guidelines from the United States Department of Education *Office of Civil
Rights*.   Nor were the family's complaints ever investigated pursuant to the School District's
own policies and procedures regarding allegations of harassment and retaliation based on
race, nationality, culture or religion as they should.   As such and as will be fully described
below, Plaintiffs now bring forth claims pursuant to Title VI of the Civil Rights Acts of

1964; 42 U.S.C. §2000 et seq.; the 14th Amendment to the United States Constitution and the Civil Rights Acts Of 1871 pursuant 42 U.S.C. Section 1983 and 1985 [Conspiracy]. In addition J.M. has a viable state law cause of action pursuant to the Chapter 106 of the Texas Civil Practices & Remedies Code [Discrimination Because Of Race, Religion, Color, Sex, Or National Origin] and also pursuant to Chapter 110 [Religious Freedom].

## II. JURISDICTION

5.   Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and §1343 because the matters in controversy arise under the laws and rules of the United States as noted above.

6.   This Court also has supplementary jurisdiction to hear state law claims pursuant to 28 U.S.C. §1367.

## III.  VENUE

7.   Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiff's claims occurred in the Western District of Texas and in the Austin Division.

## IV.  PARTIES

8.   J.M. lives in Texas with his parents, Rick Mendelssohn and Amy Birnbaum. He is above the age of eighteen (18) and has given his parents power of attorney to litigate this case. They live at 5508 Hudson Hollow, Austin, Texas, 78759 which is in the within the Austin Independent School District catchment area.

9.   Rick Mendelssohn and Amy Birnbaum file this suit not in their representational capacities but also individually to recover for derivative losses caused by the acts and omissions of Defendants Austin ISD and Vincent Wrencher.

10.     The Austin Independent School District is a school district organized under the laws of the State of Texas. At all times pertinent to this case, J.M. was a student at the Austin Independent School District. The Austin ISD may be served by Superintendent, Dr. Paul Cruz, at 1111 W. Sixth St., Austin, T, 78703. The Plaintiffs reasonably believe service will be accepted, and the District will answer this complaint by and through the Honorable Ms. Ylise Janssen, Attorney and General Counsel for Austin Independent School District.

11.     Vincent Wrencher, Sr. is a Robotics Teacher at the Anderson High School, and is an employee of the Austin Independent School District. He may be served individually at Anderson High School, Austin, Texas 78759 though Plaintiffs reasonably believe service will be accepted, and will answer this complaint on his behalf by and through the Honorable Ms. Ylise Janssen, Attorney and General Counsel for Austin Independent School District.

## V. LEGAL BACKGROUND FOR TITLE VI CLAIMS

A.      A BRIEF HISTORY OF TITLE VI OF THE CIVIL RIGHTS ACTS OF 1964

12.     Title VI of the Civil Rights Act of 1964 provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. §2000d.[1]

13.     The Department of Justice was given authority to develop regulations on the topic. For instance, after public hearing it promulgated, *Non-discrimination in Federally Assisted Programs- Implementation of Title VI of the Civil Rights Act of 1964* notes that discrimination is prohibited in that a recipient of federal funds, like the Austin Independent

---

[1]. It is uncontroverted that the School District receives federal monies and must follow the requisites of Title VI.

School District can't use race, nationality or ethnicity as a factor in denying a service or benefit[2]; or subject a person to separate treatment, or restricting[3] a student from enjoying an advantage or opportunity[4] given to another student based upon race, nationality or ethnicity. *See* 28 C.F.R. §42.104.

14.     Moreover, the District must provide assurances to students that they are in compliance with the law by making available to the students information about these regulations including, among other things, the complaint process and the name of the person at the School District who is designated to address concerns of discrimination based upon race, color or national origin. *See* 28 C.F.R. §42.106(d); §42.107; *see also* 34 C.F.R. §100.4.

15.     Further the United States Department of Education, by and through its *Office of Civil Rights*, has been given authority to investigate allegations of discrimination based upon race and allegations of violations of Title VI)[5].

16.     Importantly, 28 C.F.R. Subpart F [*Coordination Of Enforcement of Nondiscrimination in Federally Assisted Programs*] reiterates much of what is addressed above in Subpart C. It requires the School District to provide information to students about Title VI throughout the school environment, whether it be in posters, student handbooks, manuals, pamphlets, websites and other material specific information about filing complaints. 28 C.F.R. §42.405 [Public Dissemination Of Title VI Information]; *see also* 34 C.F.R. §100.6(d) [Information

---

[2]. *See also* 34 C.F.R. §100.3(b)(1)(iii).

[3]. *See also* 34 C.F.R. §100.3(b)(1)(iv).

[4]. *See also* 34 C.F.R. §100.3(b)(1)(vi).

[5]. *See* 59 Fed. Reg. (No 47) March 10, 1994 [Racial Incident And Harassment Against Students]; 68 Fed. Reg. (No. 219) 68050, November 13, 2000.

To Beneficiaries And Participants].

17.     In 1994 the DOE *Office of Civil Rights* ("OCR") produced policy guidance entitled *Racial Incidents and Harassment Against Students,* 59 Fed. Reg 47 (March 10, 1994). It set the professional standards of care for addressing harassment when based upon race. The number one item was to create a campus environment by first, training staff and by providing related supervision, so that they and the entire educational community become sensitive to related concerns regarding bullying and harassment. Among other things it noted the importance of publicizing the issue, of non-toleration of harassment based upon race, training to students, of counseling to both the victim and perpetrator, of ongoing monitoring and follow up on incidents and ongoing assessment of the school climate and policies and practices to assure effectiveness.

18.     Moreover, it reiterated the importance of assuring the parents received notice of all their procedural safeguards, including notice of who the Title VI Coordinator was and the grievance procedures available, including those at the school level, state level and federal level. In addition, the District is required to explain to the family the investigatory process, notice of who is the correct staff person to address their concerns, information about the District's duty to complete an investigation in a timely and complete manner, give copies of all investigatory findings to the parent and their right to appeal.

19.     Importantly and in addition to all the above, the District has a duty to remedy the effects of the bullying and harassment a student experienced, a response tailored to the individual needs of the student and situation. It includes but is not limited to psychological testing and services, providing or paying for counseling services for the student, referral for medical and

other community-based services, placing the students in different classes or environments or even removing the perpetrator from the hostile environment completely. In addition, a District may provide a one-to-one aide, social skills services, self-advocacy training and close monitoring of the victim. These professional guidelines and standards of care have been reiterated and reissued numerous times by and through the OCR in directives entitled a "*Dear Colleague Letter."*

20.     On September 13, 2004 the Department of Education *Office For Civil Rights*[6] issued such a *Dear Colleague Letter* later re-issued on September 8, 2010 in a letter from the United States Department Of Justice called *Title VI Coverage And Coverage Of Religiously Identifiable Groups*.[7]   Among other things it noted that:

"Groups that face discrimination on the basis of shared ethnic characteristics may not be denied the protection of our civil rights laws on the ground that they also share a common faith. Similarly, the existence of facts indicative of religious discrimination does not divest OCR of jurisdiction to investigate and remedy allegations of race or ethnic discrimination. OCR will exercise its jurisdiction to enforce the Title VI prohibition against national origin discrimination, regardless of whether the groups targeted for discrimination also exhibit religious characteristics. Thus, for example, OCR aggressively investigates alleged race or ethnic harassment against Arab Muslim, Sikh, and Jewish students."

Further that:

"Although Title VI does not prohibit discrimination on the basis of religion, discrimination against Jews, Muslims, Sikhs, and members of other religious groups violates Title VI when that discrimination is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than its members' religious practice. Title VI further prohibits discrimination against an individual where it is based on

---

[6].  59 Fed. Reg 47 (March 10, 1994).

[7].  *See*  https://www.justice.gov/
sites/default/files/crt/legacy/2011/05/04/090810_AAG_Perez_Letter_to_Ed_OCR_Title%20VI_a
nd_Religiously_Identifiable_Groups.pdf

actual or perceived citizenship or residency in a country whose residents share a dominant religion or a distinct religious identity. The inquiry into whether a particular act of alleged discrimination falls within the purview of Title VI's prohibitions will, in every case, involve a *detailed analysis* (read as "an investigation") of the allegations to determine whether jurisdiction is appropriate."

B.    AUSTIN ISD POLICIES AND PROCEDURES

21.    The Austin ISD has long had and re-authorized policies and procedures related to *Student Welfare* and keeping students free from *Discrimination, Harassment & Retaliation* (FFH Local) which address, among other things, bullying, harassment, and assault. In particular, it sets out definitions of discrimination and harassment based upon race, religion and nationality. Importantly, it has a section dealing with the duty to not retaliate against anyone because a complaint has been filed on their behalf. It provides information about the reporting and investigatory process. It requires allegations of harassment based on race, religion and nationality to be directed to the School District's Superintendent, and the family be given that person's contact information.

22.    The family also was required to receive actual notice of their procedural rights. The school District's investigation needed to be completed in a timely manner, usually less than 10 days, then a written report should be developed and interim action taken, as appropriate. The report must address whether or not prohibited contact occurred and must be filed with the relevant School District Official. If a student is not satisfied with the outcome of the investigation, he has a right to appeal the decision through the District's grievance procedure or even with the *Office of Civil Rights* with the U.S. Department of Education. (FFH Local)

23.    The Policies also note a non-exhaustive list of potential corrective actions. They include, for instance, a training program for those involved in the complaint, counseling for the victim

and even the perpetrator. There also had to be a system to follow up with the victim to assess the effectiveness of any intervention that may have been provided. There should also be, where warranted, a comprehensive education program for the school community. The district should also increase monitoring as to both the victim and perpetrator. (FFH Local).

24.    In addition, the School Board has developed a list of required professional staff development subjects for staff. (DMA LEGAL). There is nothing on that list that requires staff to take any particular training on dealing with cultural sensitivity issues as to either.  There is no specific training provided on what is termed "implicit bias" or "unconscious bias."

## VI.  FACTUAL RESUME

A.    ABOUT J.M. AND THE ANDERSON HIGH SCHOOL

25.    J.M. was born on October 16, 2001. He is now eighteen (18) years old.   He and his parents are of Jewish heritage and cultural descent.  During the period of time that makes the basis of this complaint, he was a student at Anderson High School.

26.    This High School environment is somewhat typical in today's current cultural and social climate. Students use the "N" word often endearingly to all students, not only those who are African-American but even those who are  not. Sadly, it has become part of the accepted vernacular  unless it is used as the part of actual race-based animus and only then will a School District Official formally act.  The same can be said for calling someone or something "gay" or "that's so gay."  It too has become part of the a high school student's common speech and also is left unchallenged by school officials unless it too, become part of actual sexual harassment.  Likewise for the term "retard" which is now also accepted as a synonym for something seen as foolish, stupid or dumb. It too has become part of the a high school

student's daily speech and it also is left unchallenged by school officials unless it too, becomes part of a greater part of bullying and harassment based upon disability.

27.    J.M. has been an active participant in the VEX Robotics Program since he was in the 7th grade.   In fact, during his Anderson High School career he has garnered several awards and honors with the Robotics Team. He has been supervised and mentored by Defendant Wrencher during this period.   Wrencher brought in a former student of his and current student at the University of Texas, Robert Stephany, to assist for the Fall 2018 and Spring 2019 year.

B.    THE INCIDENT IN QUESTION

28.    While in Robotics lab sometime in and around November of 2018, J.M. saw a few coins on the ground and said something to the effect of "Guess I should pick them up since I'm the Jew." Robert Stephany (who is not Jewish) apparently took great exception to this joke and reported it to Mr. Wrencher.   To the knowledge of the family no other student on the team, or their parent, nor any Anderson HS administrator notified J.M. or his parents that this joke was offensive.   In fact, through December of 2018 and January and February of the New Year, J.M. continued to travel with his robotics team winning awards without issues or concerns from anybody, until March 2019.

C.    THE SPRING OF 2019

29.    In early March Plaintiffs learned the team had qualified for the VEX World Championships scheduled at the end of April. Upon hearing the news, Mr. Wrencher let it be known to team members that J.M. would not be allowed to compete at the VEX World Robotics Competitions. A group chat among the VEX teams was created in support of J.M.   The

students were directed by Wrencher to abandon their support of J.M. or they too would be punished in some fashion. Two students, specifically Jake's teammates with whom he qualified for the World Championships, were specifically told if they continued to support J.M. they too would not be permitted to compete.

30.    On or about March 13th, J.M.'s mother learned of Wrencher's decision, not from Wrencher but through social media. In any case, his mother met with Wrencher to discuss the issue. Wrencher informed J.M.'s mother that not only was her son suspended from the VEX World Championships but was kicked off the team for this and even the following year.  This decision by Wrencher effectively ended J.M.'s high school career for Robotics.

31.    Mother then emailed the Principal, Sammi Harrison about the situation.  She informed the family and Wrencher that J.M. would be able to continue as a member of the team, both for the rest of his junior and upcoming senior year.

32.    Both mother and father, as well as J.M. then met with Wrencher.  He conveyed the message that Stephany wanted J.M. removed from the team for making a joke about Jews.  They agreed to meet after Spring Break and reported back to Ms. Harrison they would do so, so as to assure J.M.'s continued active participation in the VEX Robotics Team and Program.

33.    Wrencher refused to meet with everyone after Spring Break as agreed.  Rather he wanted to meet only with Stephany and J.M.  J.M. texted his mother who told him to not meet alone with them and wait for her. Upon arrival she found them already in a classroom apart from the robotics students.

34.    Mother told Wrencher that Ms. Harrison indicated J.M. would be allowed to participate in the spring competitions.   Wrencher stood up and said, "No. That is not happening. This

meeting is over." Father arrived shortly thereafter and Wrencher also refused to talk with him.   His only words were "Please leave" and threatened to call security a number of times if the family did not.

35.   The following day Principal Harrison had a meeting with J.M., Wrencher and the Vice-Principal Dee Biester where J.M. explained that when he was in elementary school "people made Jewish jokes all the time and he hated it" and "I do it first so that others won't do it."

36.   Ms. Harrison explained this was a fairly typical defense mechanism she sees in students sometimes.   Since there was only one incident of purported misbehavior and J.M.'s promise to withdraw from VEX Robotics if there were any new problems, Ms. Harrison informed Wrencher that J.M. would be permitted to participate at the World Competitions, and continue as member of the tam for the rest of his junior year and senior year.

37.   Following this meeting, Mr. Wrencher announced to the Robotics Team he would no longer serve as supervisor of VEX while J.M. was involved in the program also. He told everyone the building would be available to the teams but he would not make himself available if J.M. was in the building. In that situation, the parents of the students would be required to supervise their child's teams after school hours. With a month before World Championships events, the parents of the qualifying teams scrambled to coordinate a schedule to provide parental supervision for their children.

38.   The same day, Wrencher called one teammate into his office and again stated that if J.M. was on the team he would no longer support VEX and he would no longer volunteer to supervise the VEX program.

39.   Shortly thereafter Robert Stephany was removed from his position as Volunteer Mentor.  He

was upset about his removal and filed a complaint with the AISD Superintendent about J.M. and his parents.

D.     WRENCHER STARTS TO RETALIATE

40.     In previous competitions Wrencher would transport team robots on a trailer attached to his personal vehicle. In response to J.M. being reinstated to the team, Wrencher refused to transport any of the teams member's robots to the World Competitions. The students were forced to design or purchase their own boxes for air travel.

41.     Even though J.M. had been ranked as the best robotics driver in Texas, Wrencher decided to have an inexperienced underclassman drive the robot in the competition, rather than J.M. In a practice round the student was overwhelmed and ceded driving responsibilities back to J.M. Notwithstanding the ill will of Wrencher, The VEX Robotics Team succeeded at the competition by advancing to the quarterfinals of the World Championships.

42.     Before the end of the school year, on or about May 23ʳᵈ the family met with Mr. Wrencher, Principal Harrison and Vice-Principal Biester to discuss J.M.'s participation in the VEX Robotics program for his senior year.  Wrencher again brought up the "Jew joke."  He admitted he did not want to deal with the situation and his solution was to get rid of J.M.

43.     Both administrators advocated for J.M. and stated he definitely would be able to participate in the Robotics VEX Program in the fall.  In response Wrencher stated that he would not permit J.M. to be in the program, and if forced to do so, he would no longer sponsor the VEX Program which would force all the upperclassmen to register as teams completely independent of Anderson HS.

44.     About three weeks later, the family reached out to Principal Harrison looking for an update.

J.M. and his teammates wanted to start out their senior year early by working on their robot for the upcoming season. J.M.'s mother received an email from Ms. Biester asking how things were going in robotics. Ms. Biester reported she had received a list of teams for the upcoming VEX season that included J.M. and believed that the matter was resolved.

45.  On or about July 30th the parents of both of J.M.'s teammates' and a VEX parent volunteer, attended a meeting with Wrencher during which he said he would not mentor J.M., not register for competition any team that had J.M. on it, or place J.M.'s name for excused absences list for school.  No other student was so maligned.

46.  The family emailed Principal Harrison.  She responded that Wrencher did in fact phase out his involvement with the upperclassmen teams but that teams could register under the auspices of AustinCans (the collective name for all Anderson HS VEX robotics team) but there would be no teacher representative, like Wrencher involved.  Rather, the team would have to be mentored by parents.

47.  Even so, during the time all other students were in the Robotics Lab J.M. would not be permitted to be there at all, if Wrencher was also there.

48.  Apparently Wrencher and others agreed to have all the upperclassmen VEX teams dissociated from Anderson High School so as prevent the appearance of any improper treatment of J.M. by Wrencher, Anderson High School Staff and now the entire School District.

49.  Moreover, the only parental mentoring that J.M. could have was with his own parents, meaning his parents were the only ones who would have to leave work so their son could participate from a public school benefit provided all other non-Jewish students.

50.     As an obvious target of scorn and retaliation by Wrencher, J.M. became a pariah. No one wanted to have anything to do with him.  He was forced to abandon high school robotics for his senior year of high school. And that is a tragedy.

51.     Unknown to the family at that time, and even worse, Wrencher purposefully intended to harm and blackball J.M.  He wrote to a letter to the Robotics Education and Competition Foundation in March stating that J.M. was not permitted to compete but could be a spectator. He also maligned J.M.'s parents by writing if they too were in attendance there would be "potential issues."

F.     THE SCHOOL DISTRICT VIOLATED TITLE VI IN THE FOLLOWING WAYS

52.     First and foremost J.M. was singled out for making a self-deprecating joke about Jewish Culture, while other students using offensive language about race, or sexual orientation or disability are not.

53.     Moreover, and whether it be pursuant to applicable jurisprudence, regulations, executive agency directives,  Texas law, professional standards of care or School Board Policies and procedures, the Austin Independent School District violated the rights of J.M., in the following manners and particulars:

        a.     The School District Officials failed to provide the family notice of their procedural rights, as set forth by the regulations promulgated under Title VI;

        b.     They never provided the family information about who the Title VI Coordinator was for the District;

        c.     They never provided information about their right to file a formal grievance with the School District in a timely manner; and

     d.     They never provided the family information about their right to file a formal complaint with the Office of Civil Rights in a timely manner.

54.     They failed to provide J.M. school-based support services on how to address his removal from the Robotics Program.

55.     They failed to offer the parents reimbursement for their out-of-pocket expenses related to the J.M.'s removal from the Robotics Program.

56.     Moreover, the School District failed to implement appropriate safety measures to prevent the ongoing harassment from Wrencher and his Assistant.

57.     They failed to address the impact of the harassment on J.M.

58.     They failed to complete a confidential survey of Robotic Team Members.

59.     They failed to use the incident with J.M. as a teaching moment with his classmates.

60.     They failed to use the incident with J.M. as a teaching moment with staff regarding implicit and unconscious bias.

61.     There were no special auditorium programs on Title VI related issues offered to student.

62.     There were no specific classroom programs on Title VI related issues to students.

63.     There was no formal mediation set up with J.M., his parents, Wrencher and School Officials.

64.     Based upon all the above, it is clear that the Austin Independent School Board failed in a number of manners and particulars as well, regarding training and supervision of staff.

65.     For instance, even though it was evident that J.M. was being singled out because of the self-deprecating joke he told, no one ever reported the issue of discrimination bases upon race, religion or nationality to the School Superintendent as required.

66.     Whatever investigations were done by District personnel, none were completed under the

very specific purview and guidelines for an impartial Title VI Investigation.

67. Even though there are a substantial number of minorities in the Austin ISD there are apparently no specific training programs for staff on the specific cultural issues regarding race, religion, ethnicity on implicit or unconscious bias.

68. Because of the various failures of the School Board, School District personnel and Defendant personnel to correctly deal with the allegations that J.M. was a victim of harassment because he was of Jewish Heritage, descent and religion.

D.     EFFECTS UPON J.M. AND HIS FAMILY

69. J.M. has now lost a most important senior year in high school where he otherwise would be able to participate in Robotics Competitions. Additionally Defendant Wrencher, the only person at the Anderson High School who can do so, has failed to write a letter for J.M. that he could use when seeking admission to an engineering program or for a college robotics scholarship. Rather he also wrote a letter to the Robotics Education and Competition Foundation (RECF), the governing body of VEX, in advance of the World Championships that J.M. was not to participate in competition but only be a spectator.

70. The acts and omissions of the School District and Wrencher affected not only his equal access to public educational services but also impacts his ability to be accepted into a college with a superior engineering degree or superior robotics program, let alone a college of choice.

71. Moreover the acts and omissions of Defendants have affected J.M.'s ability to apply and receive scholarship support he otherwise likely would receive.

72. Additionally, Plaintiffs were forced to spend significant sums of money once J.M. was

suspended from the team.  For instance, his mother spent money and also lost income, due to missing work to chaperone J.M. at the World Championships when requested to do so by Principal Harrison.  Further, both parents missed work and lost income while meeting with Principal Harrison, coordinating the formal grievance process with Principal Harrison and the AISD, and meeting with lawyers over the last year

73.    Initially J.M.'s teammates and their parents were very supportive but as Wrencher intimidated them, their own fears of retaliation arose and they removed themselves from the debate.  Now J.M. has become more and more socially isolated.

### VII.  STATE ACTION

74.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

75.    The District, in any capacities and in all matters, acted under color of state law when it permitted Plaintiffs to be subjected to the wrongs and injuries set forth herein.

### VIII.  UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES & CUSTOMS

76.    Plaintiff incorporates by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

77.    During the relevant time period contemplated by this cause of action, the AISD School Board had an actual practice and custom of conscious and deliberate indifference to the federal law, federal rules, directives from federal executive agencies and their own School Board policies and procedures in regard to the treatment of J.M. and such failures were a moving force in the injuries to J.M. for which he seeks recovery pursuant to 42 U.S.C. §1983.

78.    Specifically, the District had a custom and practice of refusing to fulfill the requisites of Title

VI Jurisprudence and investigate allegations of harassment  after receiving complaints that such actions were based upon religious, racial and cultural animus.

79.    In addition, and in the alternative, this School Board obviously failed to correctly supervise staff in regard to the laws, regulations and directives as noted above. Such failures, in addition and in the alternative to the above, rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

80.    Last, and in addition, and also in the alternative to the above, this School Board obviously has failed to train staff in regard to the laws, regulations and directives as noted above. Such failures, in addition and in the alternative to the above, rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983. Specifically, they obviously failed to train staff on how to address complaints based upon discrimination based upon religion, race, nationality and cultural heritage. The need for such training is obvious when looking at the issues facing the greater City of Austin regarding these very same concerns. Moreover, such training is required by federal jurisprudence.

## IX.  CLAIMS BASED UPON VIOLATIONS OF THE U.S. CONSTITUTION

81.    Plaintiff incorporates by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

A.    VIOLATIONS TO THE FIRST AMENDMENT

82.    All the Plaintiffs have a right, pursuant to the First Amendment of the Constitution of the United States, to have their religious beliefs and practices protected and free from

discrimination. Defendants Austin ISD and Wrencher violated this right and Plaintiffs file this claim pursuant to 42 U.S.C. §1983 thereby.

83.   Additionally Plaintiffs have a right, pursuant to the First Amendment of the Constitution of the United States, to file grievances with the government.  Defendant Austin Independent School District failed to respond to such grievances in a timely and appropriate manner, violating their rights pursuant to 42 U.S.C. §1983 thereby.

84.   Additionally and in a related vein, J.M. became a victim of retaliation because of the advocacy his parents have undertaken on his behalf.

B.   VIOLATION TO THE RIGHT OF LIFE, LIBERTY AND THE PURSUIT OF HAPPINESS

85.   Plaintiffs contend, in addition and in the alternative to the above that the acts and omissions of Defendants Austin ISD and Wrencher violated the rights of J.M. pursuant to the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983 as such acts and omissions violated his right to life, liberty and the pursuit of happiness for the acts and omissions noted above.

C.   CONSTITUTIONAL RIGHT TO A PUBLIC EDUCATION

86.   J.M. has a cognizable property right in his education pursuant to the Constitution of the United States and Texas, pursuant to Texas Constitution, art. 7.

87.   The acts and omissions of the Defendant School District and Defendant Wrencher when treating J.M. differently than other students similarly situated because of his Jewish Religion, heritage and culture violated his constitutionally protected right to a public education for which for which he seeks recovery pursuant to 42 U.S.C. §1983.

D.   RIGHT TO EQUAL PROTECTION

88.    The United States Constitution provides that no state shall deny any person within its jurisdiction the equal protection of the law.

89.    Equally the Texas Constitution provides that "all free men...have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges." Texas Constitution, art. 1, Section 3.

90.    The acts and omissions of the Defendant School District and Defendant Wrencher when J.M. was singled out for making a self-deprecating joke about Jewish Culture, while other students using offensive language about race, or sexual orientation or disability are not so treated, evidence he was treated differently than other students similarly situated because of his Jewish Religion, heritage and culture.  As such, he was a victim of discrimination *as a class-of-one* as contemplated by the *Equal Protection Clause* of the Fourteenth Amendment, for which J.M. seeks recovery pursuant to 42 U.S.C. §1983.

E.    CIVIL CONSPIRACY

91.    Last, the acts and omissions of staff members of the Austin Independent School District; Defendant Vincent Wrencher, Individually and Robert Stephany and a number of currently unnamed parents of Robotics Team Members, demonstrate a *Civil Conspiracy* violating J.M.'s constitutional and statutory civil rights as noted herein, which may be remedied pursuant to 42 U.S.C. §1985.

## IX.  CLAIMS PURSUANT TO TITLE VI OF THE CIVIL RIGHTS ACTS OF 1964

92.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

93.    Title VI of the Civil Rights Act of 1964 and its implementing regulations require that each

state that receives disbursements, including the state's political subdivisions, not permit the student to be a victim of discrimination based upon race or racial stereotypes.

94.     Plaintiffs assert that because the Austin ISD knew that J.M. was being harassed and a victim of discrimination based upon being a member of a protected minority class, such failures as noted above, created a hostile educational environment as to J.M. and have together and separately, contributed to violating his civil rights pursuant to Title VI.

95.     Pursuant to relevant jurisprudence on the topic, including School Board Policies and Procedures, District personnel had a duty to investigate such concerns and refused to do so, violating his civil rights pursuant to Title VI thereby.

96.     In addition, Plaintiffs assert that because the School District Defendant refused to remedy the effects of the harassment J.M. experienced, whatever the cause, also violating his civil rights pursuant to Title VI thereby.

97.     Last, and separate and apart form the above, J.M. was a victim of retaliation because of the advocacy his parents undertook for him, a separate cause of action under Title VI.

## X.  STATE LAW CLAIMS

98.     Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

99.     Plaintiffs allege that the acts and omissions of the School District Defendant violates J.M.'s protected religious rights pursuant to Chapter 110 of the Texas Civil Practices & Remedies Code.

100.    In addition and in the alternative Plaintiffs allege that the acts and omissions of the School District Defendant violates J.M.'s protected civil rights pursuant to Chapter 106 of the Texas

Civil Practices & Remedies Code prohibiting discrimination because of Race, Religion, Color, Sex, Or National Origin.

## XI.  RATIFICATION AND RESPONDEAT SUPERIOR

101.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

102.   Austin ISD ratified the acts, omissions and customs of school district personnel and staff.

103.   As a result, Austin ISD is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of J.M.

## XII.  PROXIMATE CAUSE

104.   Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

105.   Each and every, all and singular of the foregoing acts and omissions, on the part of the School District and Defendant Wrencher taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XIII.  DAMAGES

106.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

107.   As a direct and proximate result of the Defendant's conduct, J.M. has suffered injuries and damages, for which he is entitled to recover herein including but not limited to:

a.      Loss of past educational opportunities;

b.      Loss of scholarship opportunities;

c.      Loss of future educational opportunities;

First Original Complaint                                                                                                     23

    d.      Reimbursement of past and future taxes collected by the Austin Independent School District from Plaintiffs; and

    e.      Various out-of-pocket expenses incurred by his family as noted above, but for the acts and omissions of the School District and Defendant Wrencher.

## XIV. ATTORNEY FEES AND COSTS

108.   Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein.

109.   It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. §2000d et seq. and 42 U.S.C. §1985 and §1988 and the Texas Civil Practices & Remedies Code §106.002 and §110.005.

## XV. SPOLIATION

110.   Plaintiffs hereby require and demand that Austin ISD preserve and maintain all evidence pertaining to any claim or defense related to the assault or other violations that make the basis of the complaint and the damages resulting therefrom, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence regarding the violations set forth herein.

111.   Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

## XVI. DEMAND FOR JURY TRIAL

112.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

**PRAYER**

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against the Defendant School District and Vincent Wrencher in the manner and particulars noted herein and above, jointly and severally and in an amount sufficient to fully compensate them for the elements of damages noted herein and above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action and for its appeal if required, together with pre-and post-judgment interest and court costs expended herein, and for such other relief as the Court deems just and proper whether it be in law, or in equity, or as to both.

> Respectfully submitted,
> /s/ Martin J. Cirkiel
> Mr. Martin J. Cirkiel, Esq.
> State Bar No.: 00783829
> Cirkiel & Associates, P.C.
> 1901 E. Palm Valley Boulevard
> Round Rock, Texas  78664
> (512) 244-6658 [Telephone]
> (512) 244-6014 [Facsimile]
> marty@cirkielaw.com [Email]
>
> **ATTORNEY FOR PLAINTIFFS**